for me. Okay, I'd like the attorneys for both sides to come forward and introduce yourselves first. And while you're coming up, I'll remind you that these microphones do not amplify. So nobody in the back can hear you and we can't hear you unless you speak up. They record, which is great, you can listen to yourself on the Internet later, but in the meantime we need to hear you today. So if you could please keep your voices up. Counsel for the appellant, please. My name is Joseph Conway Crawford, I'm the plaintiff appellant for Massive Alcazar. Thank you. Good morning, your honors. Kevin Clancy from Lewis and Gellin on behalf of the Defendants Advocate Health and Hospitals Corporation and Dr. Michael Escobar. Thank you. And how much time do you think you'll need? And how much do you want to reserve? Ten, I think I reserved five minutes. Okay, great. Good? That's fine. Okay, great. Why don't you start? Thank you. Please support. My name is Joseph Conway again. I was the second chair on the trial. Mr. Bellock was the first chair, unfortunately, during the trial. A lot of issues came up, so since then I've been taking over the whole appeal and unfortunately he's not going to be able to make it here today. The Bellocks, our family, was tied to their right to a fair and impartial trial for their untimely loss of Lenore Belkacar. This appeal not only raises important issues for the Belkacar family, but for the judicial system as a whole. In the court of law, facts and the truth matter. Here, unfortunately here, admitted facts were distorted and disputed in front of the jury. Another numerous issues about the case, I want to focus on three umbrella issues. First, the plaintiff was improperly restricted on the cross-examination of defendant Dr. Scott, who was also listed as a 213F3 witness. The defendants contradict their Supreme Court Rule 216 request for omission of fact, and Dr. Parikh, who was a subsequent treater, was erroneously allowed to testify. Briefly before I get into those three arguments, I want to go over the standard of care. I'm going to get into more about the judicial omission. The first judicial omissions are conclusive on the party making it, may not be controverted at trial, and they are not evidence. They have the effect of removing the fact from contention. Whether a judicial omission is an omission is a question of the law. The question of the law shall be reviewed de novo. Now here, there was no question that these were omitted, and it was a matter of discretion as to whether or not to enforce these omissions. Therefore, this is a question of the law, which should be reviewed de novo. You agree that only that issue is reviewed today. Will the rest of the cases be reviewed of use of discretion? Of use of discretion. Okay. Now the first issue is preventing improperly restricted cross-examination of defendant Dr. Escado. First, Dr. Escado admitted that he was the only physician who saw Ms. Belkazar, and he admitted that the standard of care required him to explain all the test results to Ms. Belkazar. Now, he ordered two CT scans immediately upon admission, Order 2. One CT scan of the abdomen and pelvis with and without contrast, so two CT scans. Now, when the second CT scan came back, it indicated that there was a mass suspicious for neoplasm, and it recommended a specialist workup. Now, when plaintiff... That's the radiologist that recommended it. Yes, the radiologist made his recommendation to Dr. Escado. It's in the report. Now, when plaintiff tried to do a cross-examination, Dr. Escado, on his ability to refer to a radiologist, defendant made a 213 objection. So after the 213 objection was made, the jury was dismissed. I think there was a short recess, and we went back to chambers to go over it. Now, the 213 objection does not apply in this case. The 213 objection is only for the party proponent of the testimony. Here, you don't make a 213 objection on cross-examination. You can never do that. We can never disclose what the expert is going to say. You have wide latitude on cross-examination. Rule 213G specifically lays out you have wide latitude. Did you at any time during the trial present any evidence or argument that the standard care required Dr. Escado to refer your client to a specialist or to have a specialist consult with her in the emergency room? No. Yes or no? No. Okay. Now, there's two parts to that. Originally, there was this open issue of Dr. Preet being out there. So we had an expert who was willing to testify to the fact that she had an ability to refer to a specialist. However, there was an issue of Dr. Preet being construed to being Dr. Preet. So rather than that turning into a big mess, we went down the line of Dr. Escado in his deposition specifically stated that he would call the primary care physician out. We're talking about trial here. Okay. So at trial, you didn't present any evidence or argument at all. Because it tends to show whether or not Dr. Escado even read the CT scan. The fact whether he referred to a specialist or not doesn't mean whether he read it or not. How can those two be mutually exclusive? Well, one, he had the ability to refer to a specialist. Well, but the question you said, no, it wasn't part of the standard of care. So, I mean, we're talking about the standard of care here. Right? So, again, we're going to relevance. Well, another issue, in his entry 13, he listed that he would refer Ms. Balthazar to a specialist. And also in the discharge instructions, it stated that we are referring you to a specialist. So we had a, we were allowed to go down, we have wide latitude on cross-examination. So we were allowed to go down that line and show, look, he had the ability to refer to a specialist. And in his deposition, he stated that this happened on another occasion, and he contacted the primary care physician. Here, none of that was done. So this is all circumstantial evidence that he never once reviewed the CT report. Well, was there anything in your complaint, your Third Amendment, your Fourth Amendment, that Or the Fifth. Or the Fifth, that Dr. Escado was negligent for failing to refer Lenore to a specialist? That Yes or no? No. So, Counselor, aren't you trying to sort of shoe her in, in something that you didn't raise before? And why would we accept that? Well, here, this was, this is, this is relevant. You have wide latitude on cross-examination. So it was relevant on the ability of whether or not Dr. Escado read it. It shows circumstantial evidence of whether or not he read it. The jury was there, and this is sort of, he said, she said, the jury heard the doctor say, Yeah, I read it. Yeah, I talked to the woman and her daughter about this. And the daughter said, no, he never talked to us about it. And the jury heard both sides. It's a jury case. Well, the jury should have heard the full facts of Dr. Escado's ability. Okay? In the jury instructions, the trial judge indicated that Uraldo used circumstantial evidence, and she used an analogy of, if it's raining outside and you see an individual, well, you don't know it's raining outside, but you see an individual walk in with a wet umbrella inside. That tells you that it's raining outside. You're allowed, the jury's allowed to use that circumstantial evidence to show whether or not it's raining outside. Here, same situation, circumstantial evidence. He had the ability to call the primary care physician. He said in the past he called the primary care physician. But the question is relevance. To me, the question is relevance. If raining outside is relevant to the standard of care, you know, if it's relevant to the case that you're trying to prove, fine. Then we want to know the circumstantial evidence. But if it's not relevant, then it doesn't matter whether it's raining outside or not. That's where I have to respectfully disagree, because here I believe it's relevant to whether or not, it shows whether or not, because no one was there to see that he said, she said. So this is an indication of whether, what did he do? We know what he didn't do. He didn't refer to a specialist. That's a fact that we know. So we know that he had the ability, and he testified before, that he usually called the primary care physician. He didn't do that here. So that's a deviation from his own custom and practice. Well, he didn't do that here? He never called the primary care physician. Well, but the primary care physician testified otherwise. No, he never actually picked up the phone. Well, he picked up the phone, but she knew about it. Right, but he testified. But do you have to pick up the phone? Is that the standard? No, but he testified that his custom practice is to pick up the phone and call the primary care physician then and there and say, this needs to be taken care of. So if he didn't pick up the phone, but she knew about it, was there a material difference? She only knew about it months later because the plaintiff, Ms. Belvedere, went into her office and signed a release of medical release authorization to get the medical records. That's the only reason that she found out about it, because the plaintiff went in there and signed a release, and the medical records was later sent to her. And this was months later. So there was never a phone call. The hospital itself never made an effort to push this to the primary care physician. One of the cases for the circumstantial evidence would be the Subzack case, which I cited. But additionally, there was no cross-examining expert. He had wide latitude. He wanted to go and do his own custom practice here. He was listed as a 213 expert. So you have wide latitude on what you can and cannot ask, because it tends to show on what happened. So further, our standard care expert testified that it's critically important that he does not sit on this evidence and that he has to do something about it. Here we know he sat on it. He didn't affirmatively do anything. Dr. Scott never made an affirmative action. He never picked up the phone. He never sent the records to the primary care. He did nothing. Our standard care expert says you cannot sit on this information. You have to do something. So in that fact, yes, it's a violation of the standard of care. Well, you said the discharge. Didn't that contradict your statement a minute ago about the discharge papers saying it's the specialist? No, the discharge instruction says we are referring you to a specialist. They never referred you to a specialist. They actually say she should go to a specialist. No, it just says in the discharge instructions, it says we are referring you to a specialist, and then obviously a specialist was never referred to. If you need cover testing, we're referring you to a specialist. But she was also advised to see her primary care physician within the next couple of days. Yes, which she did do. So she went to her primary care physician, and she told the primary care physician, I was just in the hospital a couple of days ago. I had some tests done. Okay. So she found out. The doctor found out. You just said it was months later. It wasn't months later. That's when she signed the authorization. That was partly. That was Ms. Balthazar conveying that information. That wasn't Dr. Scott conveying the information. Our expert said that Dr. Scott, I'm sorry, that Dr. Scott. I just want to understand. So what you're saying is that at the hospital, along with all the other paperwork that you get on discharge, the hospital should automatically give you a form that says, oh, I release these medical records to my primary care physician. And that apparently, that's not part of this record. So we don't know whether that happened or not. But we're not seeing that that happened at the hospital. And you're saying that because it didn't happen at the hospital, that it's the doctor's fault. No, I'm saying that the doctor. Well, the doctor. I'm sorry. Dr. Scott, the defendant, could not release these hospital records to the primary care physician without the decedent's okay. That's what we're getting at. And for some reason, that okay was not done at the hospital when Dr. Scott was talking to her, dealing with her, discharging her, whatever. Maybe it was part of the package. Maybe it wasn't. We don't know. There's nothing in this record that shows that she was given a form to release her medical records to a primary care physician. And then there's no testimony that she was given that form, and there's no testimony that she signed that form. But there is testimony that her primary care physician, Dr. Parekh, did request those forms after the decedent signed a form with Dr. Parekh, and then Dr. Parekh did get those forms. Right. We do know that. Correct. So within a month, her primary care physician found out about this test. Right. So our expert says that it doesn't end at the primary care physician. It ends at the hospital. Your doctor only has a limited time to see the patient and must set her up immediately. She needs to make sure that she gets the care she needs. So that's where he just finds that physician. There's no practice. Is it called a primary care physician or call in a specialist? And he has done it in the past. Here, he never called a primary care physician. We know that. And he never called in a specialist. We know both of those are facts. We know that. Here, he said that was his normal practice of what he did, and that was in his testimony, and that's what we wanted to go down the line of at trial. The problem, though, is that the real issue is the standard of care. If there were an expert testifying that the standard of care is to call all the family members in and tell the family members the result of the test, then that information becomes relevant as to whether or not the doctor called all the family members in to do that. But in this case, there was no evidence that the standard of care required Dr. Escada to refer her to a specialist, and there was no evidence to that by any expert, and that's where it becomes no longer relevant. So explain how it is full. Well, here, one, our expert did, in his deposition, stated that the standard of care required her to contact a specialist or the primary care. It doesn't matter where it is in the deposition. That's, yes. Right? That's where the problem came in with this, with Dr. Preethan. I'll go down the line. The question of whether or not she's going to testify, that's how it all got jumbled, because can we testify to that?  So we had to remove that allegation. That's why it ended up being removed. But our expert testified. But, again, we have to look at the trial. We're talking about the trial, with the jury. Right? I'm trying. If you have something. That's where it's going to go down in my brief argument later on, but that's another reason why the Rule 213 disclosures are dumb, so there's no surprise at trial. We were in the middle of trial, and we found out. You weren't surprised. You were in the middle of trial. Before trial began, you said, let's go ahead, whether she wasn't available at that point. You said, let's go ahead. So you knew full well that she could be called at any time and be available. Here, they knew for, this trial was set back in September, and the trial was in March. They knew that it took, there was an email. You had it out. Right? You knew when you said, let's go ahead. You threw the dice. Maybe she would be available. Maybe she wouldn't. But it seemed to me that she threw the dice, and the fact that she testified in a defense case rather than your case doesn't really make a difference. Well, here, that's where, there's a couple parts to this. Here, the federal judge ruled that, no, you can't testify. The federal, the United States attorney said, no, she's not testifying. So in all indication, she was not going to testify. It really spun out of nowhere. No, it didn't. According to the record that we have, that we've looked at, there was a discussion with the judge about this on the eve of trial. Right? Right? Prior, that was before the federal judge struck it down. So was there also a jury before trial? That was during jury selection was when it was found that it was struck down. So here, when we actually moved forward with opening statements, we, what happened at opening statements, the federal judge struck it down. The United States attorney said she's not testifying. So all likelihood, she was not going to be testifying. So we had these opening statements. We didn't discuss Preeke because we had no reasonable basis for a foundation to talk about Dr. Preeke. Now, the defendants, and I can cite the record, continually talked about Dr. Preeke, and over our objection that it continually was stricken about Dr. Preeke, and this was on record 432 to 437. The new trial attorney indicated Dr. Preeke did not end up appreciating the CT. Dr. Preeke discussed the MOT CT findings with the plaintiff. Dr. Preeke was armed with information of patient's care. At the time, it was indicated that they had already received a referral to a liver guy. This was all objected to by the plaintiff's counsel because there was no reasonable basis that Dr. Preeke was going to go in at the time. And even the trial judge indicated, sustained our objection, struck it, and said that you had no reasonable basis to believe that Dr. Preeke was going to testify. So even at that point in time, the trial judge indicated there was no reasonable basis Dr. Preeke was going to testify. So we had this hanging over us during the whole trial. So that's when we put out our entire case. And then when we had our last witness, it was just for damages, we found out that he was going to testify. That's when we said, well, we would like to call her as an adverse witness in our case. And that's when it was struck down and moved forward and we weren't allowed to call her as the last witness. Now, that completely changed everything. I mean, we would have had different opening statements. And we moved for a mistrial when we were merely told Dr. Preeke was going to testify. I'm still sort of hung up on the complaints. The second amended complaint did not include the part about not referring to a specialist. I believe the second amendment. It did include it. Yes. But the third, the fourth, and the fifth did not. So when the third, the fourth, and the fifth amended complaints did not include that part about not calling a failure to call a specialist or refer to a specialist, wasn't it just waived at that point? It can't be you can't pull it out of thin air. It's got to continue through the rest of the complaints, right? So as far as we know, in the fifth amended complaint, that was never even a cause of action. Well, we could have amended the complaint at any time. Well, you're asking us to agree with you that him not doing something, the doctor failing to refer to a specialist, was negligence. But in the third, fourth, and fifth amended complaints, you didn't allege that. I understand that. But what are we supposed to do with that? So the purpose of it is also, what I'm getting at is a wide latitude on cross-examination. You have wide latitude on cross-examination. No. The question is why should we put it back in there for you when you didn't put it in? I'm not asking for her to go back in the complaint saying that because you didn't call a specialist, it's against the standard of care. I understand that. The reason I wanted it, the reason that we believe it was relevant, was for that circumstantial evidence, the only logical conclusion that can be drawn from this failure to act on that CT report. It's in the CT report to call a specialist. That's in the CT report. That is relevant. The only logical conclusion that we can come to that you did not call a specialist is because you didn't read it. The CT report said it. We have wide latitude on cross-examination. We should be able to cross-examine what's in that CT report. Well, I don't think anybody's arguing that he read the first one without contrast. That's where we're at. And that also identified a mess. That's where we disagree because there was two CTs done. Yes. I understand where the confusion comes in the record. But even if the timing was split second on when the second one was available before he discharged her at 11.02, the first one was clearly in the records. Well, so Dr. Scott testified he saw the patient twice. I'll go back up. When Ms. Buckelsdorf first arrived, he ordered two CT scans on arrival. I know we got jumbled in the record. On arrival, two CT scans ordered with and without contrast. One was canceled because it had contrast on the pelvis. So it was canceled by the tech because you don't use contrast on the pelvis. That's why it was later reordered separately. It had nothing to do with Dr. Scott going in there and seeing a report that said, we need to do a second with contrast because of the mass. So on arrival, two CT scans were ordered. He testified that he only examined the patient twice. And his also third member testified the same, twice, upon admission and upon discharge. So we know he only spoke with her twice. And there was no time to look at any of the CT scans, no time to look at that CT scan by discussing with her. Maybe not the second one. Yes. But there was plenty of time to look at the first one. Right. But we know he did not discuss in between the CT scans. He says he did discuss it. He says he discussed it when he was discharging her. Right. And that's where he was impeached because at his deposition he said he only saw it twice. Only saw it twice. And plus the Lupe, the family member, testified that when she was there, Dr. Scott only came in twice. Now, I'll move into the... So you had the impeachment at trial, right? Is that what you said? You said he impeached him with his trial testimony? Right. He said that at trial, he impeached with a deposition testimony. Deposition testimony is where he said, I saw her on two occasions, when it was admitted and when it was discharged. So there was only two times of possible conversations. When she first gets there, normal complaints. Then he goes ahead and makes his order. He does the two orders for the CT scan. And then on discharge, this is when he can go over all the CT results and he can go over everything. And that was done at 1101. So we know... Well, that's where I live in the judicial missions here, okay? Now, this is... There may be a lot more questions than this one. So, during discovery, as we're discussing now, the time frame was tight. So that's when we requested audit trails. And a million excuses gave in the world that we cannot produce it XYZ. So General Judge Gomolinsky ordered that representatives for these computer systems come in and testify in front of them so we can get to the bottom of it, produce it as soon as possible, and go from there. So there's two computer systems at Advocate. Okay. So you have the center and the PACS. It is clear that the PACS is only for radiology, only for the radiology department. He testified in front of General Judge Gomolinsky that Dr. Scotto did not access this PACS system. He looked at the records. There's no records with him accessing it. He sent those 216 requests for admission. He doesn't have a user name. He's not able to access it without a user name. And it was pretty clear. He's not able to access the PACS system. On top of that, the lead trial attorney in Motion to Eliminate stated there's a PACS system. And Dr. Scotto did not access that PACS system. It's clear he never accessed the PACS system. HIPAA. Well, that's not clear. It depends on what we mean by the word access. If you mean that he went on because he doesn't have a password, he couldn't do it. But if somebody else went on and had it up there, he could have. Well, that's where we have HIPAA saying can I use someone else's user name. That's true. It's not HIPAA here. And you also have a new trial attorney saying he did not access PACS. He said PACS. He didn't access it. Right. I mean, we know that. But he doesn't have to. Somebody else puts it up. It's in the emergency room, right? And that's where we have a testimony from the IT director saying that you are not allowed to do it. It's against policy. You are never to do it. Wasn't there a testimony that it stays active for three hours after someone else logs in? He can then look at the system for three hours after that login period? Yes. In our deposition, she said 15 minutes. And that ended with the Cerner system. Is that the deposition? Yeah. I'm sorry. That ended with the Cerner system, not the PACS system. But she says that the Cerner system stays open for three hours, not the PACS. But he had access to the Cerner system. Right. But the Cerner system, we know he didn't access until 11 or 1. I think that hospital policy about whether or not somebody can use somebody else's passport or whether or not somebody can look at a screen that another person opens, we're not really interested in hospital policy. We're interested in his testimony that, yeah, he looked at this on the screen that somebody else had opened it and that he discussed it with the family and the family's testimony that he never discussed it. That's where we go back. And the jury heard all of that. Well, that's when we go back to the hearing from Volminsky that there was no entries for any access during that time. He did not access it. But, again, he doesn't have to. He can still look at it. Right? He can look at something. If somebody has a computer screen open in an open area like a hospital emergency room, he can go up there and look at it. Right? Right. Which is what he said. If somebody in the Volminsky transfer, if someone was accessed, it would be recorded. If it was an access period, it would be recorded. But the testimony was also that typically at the beginning of a shift or at the beginning of a day or at some point in the morning, somebody opens it up and then just leaves it open. And then if it shuts down, they call radiology, and radiology comes and opens it again. So apparently the pattern in practice in this emergency room was to just have it up and running the whole time. It's sitting right next to the one that they do have access to, and people just look at it. So that was a little murky. Well, that contradicts what happened at the end of Judge Volminsky and the judicial admissions. The judicial admissions were not accessed. But the judicial admissions were from the hospital, not from a party. Right. And a hospital can only, a corporation can only act through an agent. The agent here would be Dr. Scott. No. He never made those admissions. The doctor never made those admissions. Right. The hospital did. Right. And they were only talking about hospital policy. They weren't talking about all the probabilities and possibilities. They were just talking about the policy. It was that Dr. Scott could not access the PACS system without a user and password. So the hospital admitted that Dr. Scott could not access it. But those admissions are not good against Dr. Scott. They're only good against the party who admits them. That's the law. Unrequest to admit. Right? Well, we also have the hospital here. True. Against the hospital. But you're talking about Dr. Scott in your appeal. You're not talking about the hospital. Well, the hospital cannot, well, they can only act through their agent. No, no, no, no. Request to admit are only against the party making the admission. It doesn't matter agent or non-agent. That's a separate party. Dr. Scott is a separate party. This isn't a question of agency. He wasn't part of those requests to admit, was he? Were they signed on his behalf? So there were two sets of requests to admit to go out. There was one set that went out prior to the hearing from Judge Olmanski, and then there was another set that was sent out after that hearing, and that was sent out about 30 days before trial. We had to leave from court until 7 because it was over the lot of 28. So that was sent out secondly, and at the time Judge Olmanski only allowed to send additional ones to the hospital. Well, you're stuck with it. I mean, nothing we can do. The law is very quick. You're asking us to reverse some of the law and the rule with regard to the admission of request to admit? Well, here, Dr. Scott was an agent of that hospital. Do you have a case that says that a request to admit is an admission of an agent who is not answering the request to admit? Well, it's answering the request to admit, but here, Dr. Scott is at the hospital, correct? So he's at the hospital. He only accessed the system at the hospital. So he falls under the hospital. The hospital says he cannot do it, so the hospital admits it's impossible. It doesn't say it's impossible. In effect, apparently the testimony was that it was possible, and he did it. So, again, that request to admit is not binding. I'll be back. Well, unless you have a case that says otherwise, I don't know of any. This goes back to – there's a couple parts to this. These requests to admit were done in a long event. There were statements by the attorney. So attorneys can have judicial admissions as well by making clear, unequivocal statements. Here, the attorney for both, Scott and the hospital, said Dr. Scott did not access the PACS system. He cannot access the PACS system. Things are corrupt. That's the attorney admitting it for both parties. In addition – Where was that then? That was in the motion of Women A. I gave you the record. 256. Again, even if you're – one has nothing to do with the other. I mean, the fact that you say that proves something, that he didn't have access. Yeah, he didn't have access, meaning he can't go online because he didn't have a password. But that doesn't mean he didn't see the screen. There's a difference there. Well, he said he did not access. So? So, he said that he didn't have access. Access usually is a word used when you are trying to log on to a particular site as opposed to being able to see something. That's not called access necessarily. So, I'll quote it just so it's clear. There is a PACS system that's used only by radiology that Dr. Scott did not log into. That's true. However, Dr. Scott has mine in front of him that's not PACS. So, he's referring to a different system that is not PACS. That's what he was able to view it on. That was in the motion of Women A. And that was Record 256. And was that motion degraded? No, it was not. That was a motion degraded. Irrelevant. Counsel, do you want to talk for a minute about the jury instruction issues? So, yes, there was a jury instructions. The jury should have been instructed with 1204, to include the language that indicated that it is not the defense of some third party for some non-party of the suit may also be to blame. The notes on here are clear. It's right on line. That is used when there is evidence of a third party. Here, there is clear evidence of a third party, Dr. Parikh. Additionally, we have, should have also been given the land form 1502 on proximate cause. That's in it. Additionally, because there was information about Dr. Parikh's negligence in this case, however, they were given the same proximate cause instruction, which should not have been, especially because there was Dr. Parikh, 1501, wrong given if there is no evidence of any person contributing to the suspected offense. Here, there is evidence of Dr. Parikh. So, it was given essentially the two opposite instructions that I claim to have submitted and believe should have been correctly given in this case. Now, briefly, there was another issue of Dr. Parikh not being relevant because subsequent malpractice is not relevant to the case. Here, it revolved around a single day, June 20, 2012, of the malpractice. The plaintiff's alleged complaint had nothing to do with any subsequent malpractice that Dr. Parikh had in November and February of the following year. So, that's additionally why the plaintiff wanted to eliminate it, and there was Motion to Eliminate Number 1. However, as we know Dr. Parikh is failing, so the plaintiff did request that those instructions be given. Thank you. Okay. Thank you, Counsel. Good morning, and may it please the Court. I'd like to begin with the issue of the request to admit and this issue of the PACS system versus the PACS viewer because I believe that something is obscured in the plaintiff's presentation and the briefs and the arguments. Plaintiff refers to a comment by trial counsel about the difference between the PACS system and the zeta-millimeter that Dr. Estola had in front of him, and he referred to page 256 of the record, which doesn't tell the whole story. On page 257 of the record, R257, trial counsel goes on to explain, and I think this makes it clear, so it's technically correct that he did not log into the PACS radiology system, but that does not prevent him from seeing the radiology reports when they're verified and done by the radiologist because they come through his ER terminal viewer. What we have is this almost semantic difference, but material difference, between the PACS system itself with all of its attendant functionalities, the ability to add information and manipulate information, and a simple viewer that's available in the ER as a means of the radiology department sharing its information promptly with the attending physician in the ER. Excuse me. There was testimony from the doctor that he cut and pasted the CT scan results onto the ER system. Yes. And I just don't remember right offhand. Was there testimony about what time he did that? He did that at 1101 or 1102. So right before he discharged her. Right upon discharge. And he did cut and paste that from his monitor. And please forgive me if my memory is slow this morning. Is there any record of that cut and paste available in the system? Was there any testimony about it other than his? I don't believe that there is. I didn't see any, but I'm just asking if maybe I missed it. I don't believe there's any record of the cut. Okay. But there's a record of the paste. Oh, okay. Thank you. And, again, that's because he's cutting from the monitor, which is a passive viewer. Right. And then he entered into the CERN system, which is where there's an active record. But isn't there a delay from when the information would be available to the doctor if he's only looking at the viewer system versus the PAC system? The information is immediately available in the PAC system, but there's a delay before that information is available on the viewer system. Is that correct? As long as radiology is already logged in, which Dr. Escoto testified was the case here, the information is available on his viewer at the time it is input by the radiologist. So I believe, I mean, there might be a small delay, 30 seconds or something, but I don't believe there's any meaningful delay. So this difference between the PAC system and being able to be a user on the PAC system and have a user ID is a very important distinction. And when plaintiffs referred to trial counsel's statements in the reply brief, it brought to my attention something that I've asked the court to consider today, and that is in addition to requests to admit 4 and 5, there was also a request to admit number 2. And that request said, admit that on June 28th Dr. Escoto did not view or access Mrs. Balthazar's radiology reports via the PAC's radiology monitor or the PAC's viewing monitor in the emergency department. And the advocate denied that request. That's the request that really would have covered the field. The word review as opposed to access. Right, view versus access and system versus monitor. This is the request that would have covered the field. This request, Dr. Escoto's testimony, I would concede, would be inconsistent with an admission here. But we denied this request. So the plaintiff knew as of. So it sounds like you're saying that you agree that advocates' response to the request to admit also applies to the doctor, which is counsel's argument. No, I don't agree with that. You just implied you agreed with that. You just said that would have covered the field. So you're implying you agree with counsel. No, I really was just referring to. You misspoke? I misspoke. I was referring to the substance of the request rather than the legal effect of it. What I was doing was trying to illustrate the difference in the language between the various requests. Between access and review. Between access and review and system versus monitor. In addition, I agree with the panel that the request to admit should not be binding upon Dr. Escoto. But in addition to that, there's no contradiction. The plaintiff wants to take these two requests to admit and in the hopes that the whole thing is going to be greater than the sum of the parts, and it isn't. The whole of those two requests does not preclude Dr. Escoto from saying, I was able to see it. I was able to see it on my monitor, not that I was able to access the system. In addition to that, I believe that this entire argument was forfeited by failing to make an objection at the time. There was no objection to the testimony when it came in. There was no motion to strike and there was no request for eliminating instruction. Plaintiff argued that the previous motions eliminate should have preserved the issue, but we know that a denial of the motion eliminate doesn't preserve any error. And then argued that this proposed jury stipulation, this federal jury stipulation, should preserve the issue. That, again, is after the fact. In addition to that, there's really no discussion in the record as to what that jury stipulation said or didn't say. What we do know is that it was something from federal court and the judge here decided that it was inapplicable. What about the big surprise to the plaintiffs about Dr. Porecka's testimony? Dr. Porecka's testimony was no surprise to the plaintiff. That's what they say. They started the trial and right before trial, the federal court said, it's not happening. Right. I think that it's difficult to think of a record that is clearer where the trial judge did a better job than she did here of making it clear from the beginning through the trial as to what was out and what was in. She said a number of times, you can't use the discovery deposition as an evidence deposition. That's out. But if Dr. Porecka is available, she's going to testify. It's going to come in. The plaintiff made a strategic decision, which they're entitled to do, as to how to present their case and how to present the timeline of events in this case. But how was Dr. Porecka's testimony relevant to Dr. Escotta's negligence? Yes. The plaintiff's expert, Dr. Corey, said that the standard of care required Dr. Escotta to give Mrs. Balcazar the information she needed to be armed going forward to get the care that she needs. Dr. Porecka's testimony is directly relevant to whether Mrs. Balcazar was properly armed going forward. Plaintiff has this desire to narrow the scope of this entire case to three hours in the ER on June 28, 2012. But that's not what Dr. Corey is talking about. Dr. Corey's standard of care opinion anticipates some discussion of what happens when you leave the ER. And what we know is Dr. Escotta testified that he did provide this information to Mrs. Balcazar through her family. The family knew that they had to make a follow-up appointment. They did make a follow-up appointment. Dr. Porecka requested the ER records. She obtained the ER records no later than August of 2012, two months later. And she noted in her records, advocate ER records, I'm sorry, trinity ER records received, suspicious mass, you know, neoplasm, et cetera. So what Dr. Porecka did and what information she had is relevant to the issue of whether Dr. Escotta did what Dr. Corey said he should do, if that makes sense. What about the plaintiff's argument that because they didn't know for sure that Dr. Porecka was going to testify, their opening argument was messed up? Their opening statement was the opening statement they wanted to give based on a strategic choice they made with eyes wide open. There were a number of ways that the plaintiff was in control of how to try their case and how this testimony would come in. First, they could have stipulated to the medical records. That was a big discussion in the early days before the trial began. The plaintiff refused to stipulate to the medical records in this case. If that was the case, they would have come in as substantive evidence, rather than just evidence the experts relied on under Wilson versus Clark. The plaintiff then says in response to that, well, I couldn't stipulate to the records because I wouldn't be able to cross-examine them because Dr. Porecka's not actually here. That's not true either. At every medical visit, Mrs. Balthazar was accompanied by one or more of her adult children for purposes of translation and family support, et cetera. The plaintiff had the ability to call one or more of those adult children and ask them about the interactions with Dr. Porecka. She says that there's a reference in the record to your mom seeing a liver specialist. Did she ever see a liver specialist? No, she didn't. The plaintiff had the tools available to introduce that testimony the way they wanted to. In addition, there were two requests for continuance to get this issue resolved, and the plaintiff objected to both of those requests. Now, I suppose the court could have continued the trial anyway, but that's not really how things are happening today in terms of trying to move cases along. If there's an agreement, they might, but here the plaintiff wouldn't agree. The plaintiff wouldn't agree, frankly, because it was beneficial. The chance that Dr. Porecka may never come in and testify was more beneficial to them than certainty. They could have opted for certainty, and they chose uncertainty. So I don't believe it's a surprise. But it comes back to the question here is whether or not Dr. Estrada reached the standard of care as he treated the patient in the emergency room. Dr. Porecka's testimony has absolutely nothing to do with that. I disagree with that. It's showing how it's relevant to whether or not the standard of care was breached. Their argument is that he should have referred her in the emergency room, and he didn't. He didn't refer her to a specialist. There's evidence, and I realize the jury has heard of this, but there was evidence that he said nothing about the mass. And so the question is did he breach the standard of care? Now, we bring in Dr. Tariq to talk about, Dr. Porecka to talk about all these things about what the patient didn't do well under her care, but that's not relevant to whether a doctor has got to breach the standard of care in the emergency room. And here's an important issue. With regard to the standard of care of Dr. Escoto, the plaintiff began today by discussing what they described as a severe limitation on their ability to cross-examine Dr. Escoto. First of all, it wasn't a severe limitation. It was an objection to one question, and that one question was not about referring to a specialist. It wasn't about telling Mrs. Balthazar. You're changing the subject a little bit, but that's okay. I'll let you go the way you want to go. I'm trying not to change the subject. I'm just giving a little background. Absolutely. Go ahead. I want you to present your argument the way you see fit. The standard of care, what they're arguing is not that he had a duty to refer the patient to a specialist. The question on that cross-examination was, did you have the ability to call somebody down to the ER today to have them evaluate Mrs. Balthazar? And on that issue, as well as the referral, there was no testimony that the standard of care required Dr. Escoto to do anything with regard to getting a Well, what the plaintiff wanted to do is to establish the standard of care using Dr. Escoto. Yes. And there's nothing illegal about using Dr. Escoto to establish the standard of care. That's what they attempted to do. They weren't allowed to do that. They're actually ‑‑ They're precluded. I believe there actually is. They wanted to establish the standard of care solely through Dr. Escoto's personal practices, which I think is flawed for two reasons. One, I believe the case law is clear that you're not allowed to establish standard of care solely through the testimony That's just part of the testimony that they wanted to get in. That would have been the only testimony in the record from anybody that the standard of care required some kind of a referral or a visit by a specialist into the ER. Nobody else testified to that. But doesn't that ignore the fact that this wasn't even part of their Fifth Amendment complaint? Yes. So they weren't complaining about it. Right. It wasn't before the court. Right. At the end of the day, this is a relevance objection. Plaintiff describes it as an improper 213 objection. Yes, trial counsel did say 213, but what he meant was this isn't a disclosed opinion. This isn't part of anybody's theory of the case. And so it's not proper to be bringing this in, whether it's through Dr. Escoto, through personal practices, which I believe is not proper, or any other witness, which there was no other witness, because it's a relevance matter. As to Dr. Parikh, again, her testimony is relevant because it bears on whether Mrs. Balcazar was properly armed when she left the ER. And the way we know she was properly armed was because her family members made the appointment two days later. That's something that the standard of care required Dr. Escoto to communicate. And this is about a handoff. You're an emergency room physician. You're running down with a patient. That's the nature of the practice. This is about the handoff. The standard of care requires information to be communicated during the handoff. And I believe what Dr. Parikh says about the information she had available to her and how she got it is evidence that Dr. Escoto properly handled that handoff. But neither of the CAT scans were on the discharge information. True. And that is, there was testimony that that's the practice at Trinity, that they just don't put every test on the discharge instructions? Right. That was pretty important medical information. It was important medical information. But the testimony was it's not uncommon for that not to be a part of the discharge instructions. That medical information is most important in the hands of the primary care physician who will be evaluating you going forward. And there was testimony from Dr. Parikh that she had it when she asked for it. Yes. And that's why I believe that Dr. Parikh's testimony was relevant to Dr. Escoto's standard of care. If there's no other questions, I would ask that this panel affirm the decision of the trial court. Thank you. Brief and total questions. I'll make this quick. I want to address a few questions that you had regarding this cut and paste. So the cut and paste was done on a sonar system. That's where he charts them. We know that. The cut and paste was done at 1101. The legit cut and paste, but that's okay, was done at 1101. Now, this was after he discharged the patient. This is when he gave the note, I discussed diagnosis with the family. He didn't describe what diagnosis it was, but in the note it says, 1101, he's writing this note. We know he's doing it at 1101. I discussed the diagnosis with the family. This was done at 1101, and I discharged the patient. So what he does, he then comes out of the discharge papers, the nurse gives it to the family, and they go. So we know the first time he could possibly see it on the sonar system is at 1101. And this is when he made the note saying he already discharged him. So if he already discharged him, hasn't seen him again, this is the first time he could see it. He didn't talk to him about it. We have more evidence from the discharge instructions. There's two blank lines where the CT reports are supposed to go. There's lines where it has blood tests, urine tests, x-ray. That's all listed, and it's time that it's done is listed. However, there's two empty lines, blank, and on those times, the times match up with the CT reports. So there's no evidence in the discharge instructions that a CT report was done. Additionally, we had an expert say, this was in court, that there has to be no uncertainty in what she has verbally and in writing, and in writing, what she had. That was not done here. We know it was never done on the discharge instructions. There's blank lines. We know that. And we'll go back to this PACS system where they say, no, we can see it on this open PACS radiology monitor. I'll get back to it. We'll cover that. Lenoir-Belkazar, there's an additional question that I'll point you to. A-91, that no users viewed or accessed. Viewed or accessed. No user. Lenoir-Belkazar's radiology monitor reports on the PACS system at any time after 10-58. At any time. No user. So that covers just the hospital. That covers anyone. That covers some radiology walking up and doing it at 10-58 and after. The report was done at 10-58. So unless you saw it in the split second, you didn't see it. No user saw it. No one accessed it. That's on the other request, number four, A-91. That would be the CT scan with contrast. Correct. But no one used that system at all. So they couldn't view anything on PACS. No. They could have seen the CT scan without contrast any time in that three-hour period. Correct. But no one saw it. He couldn't have seen that second one. Well, that's what you're saying. He's saying he testified that he did see it and that he talked to her about it. Right. And that's what we have. So if you assume that he did it to call the radiology and someone logged in and looked at it, if you assume that, well, we know that's not true because it couldn't have because it was requested from the hospital, that no user ever logged in on PACS and ever looked at it at all at 10-58. Thank you, counsel. Anything else? I do. I'll stay on the brief with the improper jury instructions. Just one more thing. I apologize. I actually read a brief you just assigned of a recent opinion you had about in the breeze, you don't like bull. I apologize. I made some little marks in here. I appreciate it. I will not do that again. Gentlemen, thank you very much for your briefs and good argument. We will take this case under advisement. This Court will recess briefly while we change panels.